IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WELTON ENTERPRISES, INC., WELTON
FAMILY LIMITED PARTNERSHIPS and
3PP PLUS LIMITED PARTNERSHIP,

                          Plaintiffs,                          OPINION & ORDER

         v.
                                                              13-cv-227-wmc

THE CINCINNATI INSURANCE COMPANY,

                          Defendant.

In April of 2011, a hailstorm dented the rooftops of numerous structures in Middleton, Wisconsin, giving rise to the usual insurance claims, sales of property, settlements and lawsuits. Many of the latter centered around whether the applicable commercial insurance policies provide coverage. Among those structures were commercial buildings owned by the plaintiffs, Welton Enterprises, Inc., Welton Family Limited Partnerships and 3PP Plus Limited Partnership (collectively, "Welton"). More than four years later, Welton and the insurer of those buildings, The Cincinnati Insurance Company ("Cincinnati Insurance"), continue to litigate this question.

Cincinnati Insurance contends that because the denting is purely cosmetic and is not visible from the ground, it does not constitute "direct physical loss" under the applicable policy; it also asserts various coverage defenses, including non-cooperation. Welton, on the other hand, argues that the policy provides coverage regardless of the nature of the denting and maintains that Cincinnati Insurance's insistence to the contrary constitutes bad faith.

Before this court is Cincinnati Insurance's motion for summary judgment (dkt. #95). For the reasons that follow, the court concludes that the denting to Welton's roofs

constitutes "direct physical loss," whether cosmetic or not, and will deny Cincinnati Insurance's motion on that point. At the same time, Cincinnati Insurance is entitled to summary judgment on Welton's claim that its position on coverage constituted bad faith. Finally, the court will deny Cincinnati Insurance's motion as regards its newly-asserted coverage defenses.

BACKGROUND

## I.  Hailstorm and Policy Language

The April 3, 2011, hailstorm dented the roofs of twelve commercial buildings owned by Welton. At the time, those buildings were insured by a commercial policy that included the following "Coverage" language in Section A: "We will pay for direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Aff. of Bruce P. Graham Ex. A (dkt. #98-1) Page 3 [hereinafter "Policy"].)[1]  The Policy defines "loss" as "accidental loss or damage," but does not define "direct" or "physical." (*See id.* at 33-35 ("Definitions").)

In the event of a covered loss, Cincinnati Insurance has four options under the terms of the Policy, two of which are relevant here: (1) "[p]ay the value of lost or damaged property" or (2) "[p]ay the cost of repairing or replacing the lost or damaged property." (*Id.* at 28.)  The Policy provides that Cincinnati Insurance will determine the value of covered property at "'Actual Cash Value' as of the time of 'loss,'" subject to certain exceptions not relevant to this lawsuit. (*Id.* at 30.)  Actual Cash Value ("ACV") "means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence." (*Id.* at 33.)  In

---

[1] To avoid confusion, when citing to the Policy, the court will use the page numbers in the Policy's bottom right hand corner unless otherwise noted.

contrast, "Replacement Cost" does not include a deduction for depreciation and replaces ACV if elected.  (*Id.*)

Section D.3 of the Policy also imposes certain "Duties In The Event of Loss or Damage" on the insured, Welton, "in order for coverage to apply[.]"  (*Id.* at 27.)   In relevant part, those duties include:

> (2) Give us prompt notice of the "loss."  Include a description of the property involved.
>
> (3) As soon as possible, give us a description of how, when and where the "loss" occurred. . . .
>
> *****
>
> (5) At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of "loss" claimed. . . .
>
> *****
>
> (8) Cooperate with us in the investigation or settlement of the claim.

(*Id.*)

## II. Past Litigation

In *Advance Cable Company, LLC v. Cincinnati Insurance Company*, No. 13-cv-229-wmc, 2014 WL 975580 (W.D. Wis. Mar. 12, 2014), a companion federal case to this one, this court concluded on summary judgment that that the "direct physical 'loss'" language established coverage even for non-structural, non-visible denting to metal roof panels.  *See id.* at *7-12.   The court also held, however, that Cincinnati Insurance's position was fairly debatable, and granted Cincinnati Insurance summary judgment on that claim.  *Id.* at *12-15; *see also Advance Cable Co., LLC v. Cincinnati Ins. Co.*, No. 13-cv-229-wmc, 2014 WL

3

2808628, at *7 (W.D. Wis. June 20, 2014) (denying reconsideration on bad faith claim). The Seventh Circuit affirmed both conclusions on appeal.  *See Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746-49 (7th Cir. 2015).  The *Advance Cable* case did not, however, involve any additional coverage defenses, such as non-cooperation.

In addition, plaintiffs would make much of Cincinnati Insurance losing a similar construction argument over the phrase "direct physical loss" in a separate lawsuit brought against it by Hy Cite/Welton, LLC, in the Circuit Court for Dane County, Wisconsin, although that decision amounts to a one-page order issued in April of 2015, which denied Cincinnati Insurance's motion for summary judgment "for reasons set forth on the record during the hearing."  Not only does it appear no transcript was ever requested for that hearing, preventing this court from determining the basis for the order, but a final judgment has yet to be entered by the circuit court.  *See Hy Cite/Welton, LLC v. Cincinnati Insurance Company*, No. 2013CV002123 (Wis. Cir. Ct. Dane County Apr. 27, 2015).

### III. Facts Related to Investigation and Claims Procedure

On this record, exactly *when* Welton first discovered the denting to its roof remains unclear.  Welton's brief states that it first discovered the damage in the summer of 2011, when Scott Martin of Great Lakes Roofing inspected them, but its citation to Martin's affidavit in support is flawed in two respects.  *First*, Martin does not say he inspected the roofs in summer; he says only that he went on the roofs "after the April 3, 2011 hail storm." (Aff. of Scott A. Martin (dkt. #115-1) ¶ 4.)  *Second*, Martin's affidavit describes his inspection of property located at 2113 Eagle Drive in Middleton -- property that was a part of *Advance Cable* case, but does not appear to be part of the present case.

There is evidence that on September 27, 2011, Joanna Burish, Welton's CEO, sent an e-mail to agents Robyn Henslin and Steve Squires at Hausmann-Johnson Insurance ("Hausmann") asking how to arrange for the inspection of certain properties for hail damage.[2] (Aff. of Timothy J. Casper Ex. H (dkt. #115-8).)  Henslin responded the next day, indicating that she had forwarded the list of buildings to Hausmann's in-house claims person, Nick Veech.  Veech e-mailed Burish on September 28, providing the names of roofing contractors to whom he had sent the addresses to be inspected.  (Decl. of Mark W. Rattan Ex. C (dkt. #97-3).)  Veech also wrote that once they had determined "the extent of the damage to the buildings," Burish should inform him so he could "get the claim information put together and sent in to Cincinnati."  (Id.)

On November 18, Burish e-mailed Henslin and Squires indicating that the roofers Veech had recommended had not worked out and that they had retained Great Lakes Roofing to inspect the roofs.  (Decl. of Mark W. Rattan Ex. E (dkt. #97-5).)  Squires responded asking Burish to "send a list of the properties you want to make a claim on along with any reports that you have."  (Aff. of Timothy J. Casper Ex. G (dkt. #115-7).)  Squires further copied Veech and Curt Jorgenson, Cincinnati Insurance's claims representative, on this e-mail.  (See id.)

On November 21, Jessie Reed of Hausmann responded to Burish's e-mail asking for a list of damaged locations.  (Decl. of Mark W. Rattan Ex. A (dkt. #97-1).)  Burish responded that Martin would provide the list of damaged properties along with further details.  (Id.)  The next day, Reed e-mailed again, indicating that she had not yet received the list of

---

[2] Hausmann was Welton's "broker."  According to Cincinnati Insurance, an ordinary claims process would involve the policyholder (Welton) notifying its broker of the claims, with the broker in turn submitting an "Accord Form" to Cincinnati Insurance.

damaged properties. (*Id.*) Burish then provided the same list of highlighted buildings she had previously submitted as Welton's CEO in late September. (*Id.*)

In the end, Welton apparently never provided Cincinnati Insurance with a copy of any report from Martin or Great Lakes Roofing regarding its actual loss claim. (Aff. of Curt Jorgenson (dkt. #99) ¶ 5.) On November 22, Welton did submit an "Accord Form" to Hausmann entitled "Property Loss Notice," which apparently was intended to provide formal notification of "[h]ail damage to various locations." (Aff. of Bruce P. Graham Ex. B (dkt. #98-2).) Hausmann provided that form to Cincinnati Insurance the same day.

In response to this form, Cincinnati Insurance retained a roofing expert, Greg Phillips of Structural Research, Inc. ("SRI"), to inspect the buildings. On December 7 and 9, Phillips inspected the twelve buildings at issue and provided a report. (Decl. of Mark W. Rattan Ex. G (dkt. #97-7).) The SRI report concluded that several of the identified buildings had "[m]etal roofing panel denting characteristic of hail impact," which varied "from barely discernable to approximately 1" in overall diameter." (*Id.* at WEL 03166.) The report went on to conclude:

> It is our opinion that the metal roof panel denting we observed will not affect the performance of the panels (roofs) or detract from the panels['] (roofs[']) life expectancy. Panel denting caused by hail impact will not affect the panels['] ability to resist corrosion due to the galvanized panel plating. The denting that occurred as a result of hail impact was relatively minor and cannot be view[ed] from ground level.

(*Id.* at WEL 03166-67.)

Welton points out that copies of Cincinnati Insurance's claim notes, which memorialize Philipps' inspections, indicate "[e]vidence of minor scattered hail damage to metal roofing." (Aff. of Timothy J. Casper Ex. E (dkt. #115-5) 4.) By letter dated January

6

5, 2012, and addressed to Burish, Jorgenson attached the SRI report.  Jorgenson's letter also indicated that while some of the properties' roofs were dented, SRI had determined the dents would not affect the roof performance or life expectancy.  (Decl. of Mark W. Rattan Ex. G (dkt. #97-7).)  His letter concluded, "Please review the enclosed report.  I will be glad to meet with you to discuss the report and any other issues on this claim."  (*Id.*)

The next day, Welton's CEO Burish sent its insurance agent Squires an e-mail strongly objecting to Cincinnati Insurance's response letter.  (*Id.* at Ex. H (dkt. #97-8).)  Squires wrote back the same day, reiterating that the SRI report concluded there was no damage to the finish of the metal or the roof's structural integrity.  He advised, therefore, that "If you or your roofers have information to the contrary, please forward that information to Curt Jorgenson the claims [r]epresentative[.]"  (*Id.*)  CEO Burish responded that she was meeting with Martin and with Ken Brayton of Target Construction to gather data regarding the condition of the roof and would be "happy to present the materials once we've gathered it all."  (*Id.*)

In what would become an increasingly painful dance over who would actually undertake the work of assigning *any* dollar value to the claimed damages, or equally likely who would make the first offer to resolve the dispute, insurance agent Squires e-mailed CEO Burish on January 15, 2012, asking if she had received anything from her roofer, so that they could meet with Jorgenson.  (*Id.* at Ex. I (dkt. #97-9).)  On January 18, Burish responded, "What exactly are you needing for our roofer?  My understanding is that your adjuster and engineer are to get the cost analysis to Ken and Scott."  (*Id.*)  Squires wrote back that day, stating, "I will check with Curt of Cincinnati.  I thought you were getting a written opinion of damage in terms of dollars and also specifically the damage to the steel,

roof and finish on the steel."  (*Id.* at Ex. J (dkt. #97-10).)  Welton's contractor Brayton also wrote to Burish on January 18, indicating he was in the process of gathering information to reply to the SRI report and Jorgenson's letter.  (*Id.* at Ex. K (dkt. #97-11).)

On January 23, Agent Squires sent an e-mail stating, among other things, that:

> Cincinnati and their third party engineer found no damage to the finish and life expectancy of your metal roofs.  They requested any proof you had to the alternative and they would consider.  To date, Curt Jorgenson has not received.

(*Id.* at Ex. L (dkt. #97-12).)  Burish responded:

> Finally, onto the hail damage report that Curt said he's waiting for.  It was not our intention to provide the cost for repairs as that is what the Cincinnati engineer was hire[d] for by Cincinnati.  Scott Martin was there purely because I asked him to be there as an additional set of eyes to either agree or disagree with that engineer's report. . . . It is not Scott's job to tell Cincinnati what the costs are and I instructed him not to do so as I wanted to wait to hear what Cincinnati's estimates were first.  Being that their estimates came in at 'zero', I brought Ken Brayton into (*sic*) advise us and any further discussions on this issue will go through him only.

(*Id.*)

Squires wrote back the same day, stating that Cincinnati Insurance was "not looking for numbers at this point, they are looking for a roofing expert to prove their engineer is wrong as far as their opinion of no damage … to finish and life expectancy."  (*Id.* at Ex. M (dkt. #97-13).)  On January 24, Brayton and Jorgenson spoke via telephone; the next day, Brayton e-mailed Jorgenson stating that Wisconsin Administrative Code Section Ins 6.11 *required* Cincinnati Insurance to provide an estimate of damages and scope of repairs.  (*Id.* at Ex. N (dkt. #97-14).)   Brayton also stated, "The metal roof panels on the roofs in

8

Middleton are damaged," although he again provided *no* expert opinion, data or analysis supporting this claim.

At some point, Jorgenson apparently decided to try to by-pass Brayton, instead sending a letter to his employer, Target Construction, to advise that Cincinnati Insurance had retained Tim Coppock to re-inspect the properties and handle the matter going forward. (*See* Decl. of Jhon Linares (dkt. #115-9) ¶ 11.) Jhon Linares, one of Target's owners, represents that he made multiple attempts to confer with Coppock, but was never able to schedule a joint inspection, and that Cincinnati Insurance terminated Coppock's involvement as of April, 2012. (*Id.* at ¶¶ 13-17.) Linares also avers that no one from Cincinnati Insurance ever requested that Target submit any reports or information. (*Id.* at ¶ 19.)

Apparently fed up, though still not assigning any specific monetary number to the costs of repair, Welton ultimately filed this lawsuit on April 2, 2013. (*See* dkt. #1.) On this record, it is also unclear when Cincinnati Insurance actually denied Welton's claim. Welton contends that Jorgenson's letter of January 5, 2012, constituted a denial; while Cincinnati Insurance points out that: (1) the January 5 letter never actually denies the claim; and (2) Cincinnati made numerous, subsequent attempts to get Welton to submit additional information and settle the dispute.

## OPINION

### I.  Direct Physical Loss

As an initial matter, Cincinnati Insurance essentially asks this court to revisit its earlier ruling in *Advance Cable* that purely cosmetic denting may constitute a "direct physical

loss" under the Policy.  Specifically, Cincinnati argues that to establish a direct physical loss, Welton must prove here that the denting reduced the roofs' usefulness, expected useful life or ability to function as roofs, again relying on some of the same district court cases it cited to this court and on appeal to the Seventh Circuit in *Advance Cable*, as well as a few new ones.  (*See* Def.'s Br. Support Summ. J. (dkt. #96) 22-26.)

Cincinnati Insurance's apparent invitation to depart from the Seventh Circuit's decision in *Advance Cable* and to follow newly-cited district court decisions is a complete non-starter, since the court is bound by the Seventh Circuit's holding.[3]  With the benefit of the Seventh Circuit's opinion in *Advance Cable*, therefore, the court will address Cincinnati Insurance's construction arguments in this case.

Taking the word "direct" first, the Seventh Circuit explained that "common sense suggests that it is meant to exclude situations in which an intervening force plays some role in the damage."  *Id.* at 746.  This adjective is, therefore, of no help to Cincinnati since just as in *Advance Cable*, "to the extent [Welton's roofs were] damaged at all, everyone agrees that the hailstorm was the culprit."  *Id.*

---

[3] In any event, the newly cited decisions are not particularly helpful to Cincinnati.  For example, the court in *Demers Brothers Trucking, Inc. v. Certain Underwriters at Lloyd's, London*, 600 F. Supp. 2d 265 (D. Mass. 2009), noted only that property suffering merely cosmetic damage "would *likely* not satisfy" provisions extending coverage for direct physical loss or damage; it did not need to analyze the question because the insured was entitled to recover under the common law doctrine of mitigation.  *Id.* at 274 (emphasis added).  *Mohr v. American Automobile Insurance Company*, No. 01 C 3229, 2004 WL 533475 (N.D. Ill. Mar. 5, 2004), *did* involve hail denting to a roof, but that is where the similarities between cases end.  Based on the language of the policy in *Mohr*, the relevant question was whether it was "*necessary*" to replace an entire roof that had, for the most part, suffered only unsightly pockmarks, or whether spot repairs would suffice.  *Id.* at *10 (emphasis added).  The court concluded that although aesthetics were important to that particular roof, "[e]veryone agreed that the marks would fade over time," so "the pockmarks, by themselves, would not have made the $400,000 replacement *necessary*."  *Id.* at *13 (emphasis added).  Nowhere did the *Mohr* court discuss "direct physical 'loss'" language in the policy, nor hold that the pockmarks did not fit that description.

The Seventh Circuit also held that the denting "change[d] the physical characteristics of the roof and thus satisfie[d]" the Policy requirement that the denting be "physical," rejecting Cincinnati Insurance's reliance on *Crestview Country Club, Inc. v. St. Paul Guardian Insurance Company*, 321 F. Supp. 2d 260 (D. Mass. 2004). *Id.* at 746-47.  In *Crestview*, the plaintiff wanted coverage for "intangible changes to the . . . character" of a hole on a golf course; in *Advance Cable*, as here, plaintiff wants coverage for *tangible,* physical indentations to the roofs' surfaces. *Id.* at 747.  Thus, although Cincinnati Insurance renews its *Crestview* argument here, this court is bound to reject it as inapposite without further need for discussion consistent with *Advance Cable*.

Finally, we come to Cincinnati Insurance's principal, construction argument:  that purely cosmetic denting cannot constitute "loss" as defined in the Policy.  Unfortunately for Cincinnati Insurance, this, too, runs into the same roadblock.  In *Advance Cable*, this court previously emphasized the disjunctive nature of the definition of "accidental loss or damage," which suggested that even without a quantifiable "loss" in value or function, there may still be "damage" that triggers coverage.  2014 WL 975580, at *10-11.  The Seventh Circuit agreed, noting that Cincinnati Insurance offered no reason to believe that the inclusion of "or damage" in the definition of loss was superfluous, nor any other explanation for the inclusion of both words.  *Advance Cable*, 788 F.3d at 747.  The Policy at issue here also defines "loss" as "accidental loss or damage," and Cincinnati Insurance again fails to explain why the definition is written this way if *both* possibilities mean a reduction in usefulness, value or lifespan.  As the Seventh Circuit held in *Advance Cable*, "[t]here is no exception to the definition of 'loss' for cosmetic damage, or any other kind of particular

damage.  Had Cincinnati wished to exclude cosmetic damage from coverage, it should have written the policy that way." *Id.*

Accordingly, the court must conclude that the Policy language here requires Cincinnati Insurance to compensate Welton for "direct physical loss" to its buildings, and that "the hail, in denting the building[s'] rooftop[s], physically and directly damaged [them]." *Id.* at 748.  Cincinnati Insurance's motion for summary judgment on that question must be denied.[4]

## II. Bad Faith

Cincinnati Insurance also moves for summary judgment on Welton's bad faith tort claim.  "A plaintiff bringing such a claim must show two things: the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Advance Cable*, 788 F.3d at 748 (quoting *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 26, 334 Wis. 2d 23, 798 N.W.2d 467) (internal quotation marks omitted); *see also Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978).

This test includes an objective and a subjective component. *Brethorst*, 2011 WI 41, ¶ 30.  "The objective element tests 'whether the insurer properly investigated the claim and whether the results of the investigation were subject to a reasonable evaluation and review.'" *Advance Cable*, 788 F.3d at 748 (quoting *Brown v. Labor & Indus. Review Comm'n*, 267 Wis.

---

[4] Due to this legal conclusion, the court need not decide Welton's assertions that issue preclusion bars Cincinnati Insurance from attempting to re-litigate the coverage question.  However, absent an unlikely reversal of the Seventh Circuit's *Advance Cable* decision, or a contrary ruling by the Wisconsin Court of Appeals or Supreme Court in *Hy Cite/Welton*, Cincinnati Insurance would appear estopped from relying upon (much less making) a similar construction argument going forward that the phrase "direct physical loss" does not encompass so-called "cosmetic," non-visible hail damage to a roof under Wisconsin law.

2d 31, 671 N.W.2d 279, 287-88 (2003)).  "[W]hen a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." *Anderson*, 85 Wis. 2d at 691. The subjective element asks whether the insurer was aware there was no reasonable basis for denial or displayed "reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." *Advance Cable*, 788 F.3d at 748 (quoting *Anderson*, 271 N.W.2d at 377).

Welton contends that both Cincinnati Insurance's coverage position and its evaluation of Welton's claim were objectively unreasonable.  With respect to Cincinnati Insurance's coverage position, Welton relies primarily on the fact the court has determined cosmetic denting falls within the ambit of the Policy's "direct physical loss" language.  (*See* Pls.' Br. Opp'n (dkt. #114) 17 ("Here, Cincinnati denied Welton's hail damage because it was a 'cosmetic' and not a 'structural' los[s].  Yet the policy does not distinguish between those losses.  The plain language of the policy . . . unambiguously provides coverage[.]").)  The Seventh Circuit held in *Advance Cable*, however, that "Cincinnati's reading of the policy, while wrong, was not beyond the pale[.]"  788 F.3d at 748.  There, as here, Cincinnati Insurance offered plausible readings of some of the policy's terms and was "able to find federal cases that provided some support for its position."  *Id.*  As in *Advance Cable*, this court again rejects Welton's "draconian" attempt to premise bad faith liability on an incorrect reading of its Policy language.  *Id.*  Of course, now that Cincinnati Insurance's construction argument has seemingly run its course under Wisconsin law, a similar position in the future might well move beyond wrong to wrongheaded.  *See* discussion *supra*, n. 4.

Welton also points out, as did Advance Cable, that Cincinnati Insurance subsequently sought approval from the Wisconsin Office of the Commissioner of Insurance

13

for a new coverage limitation entitled "Coverage Limitations for Roofs and Roof Surfaces." (*See* Aff. of Timothy J. Casper Ex. K (dkt. #115-11) ECF 7.)  This new coverage limitation would exclude "cosmetic damage that alters the physical cosmetic appearance of any part of the roof or roof surfacing but does not prevent the roof from functioning as a barrier to entrance of the outdoor elements." (*Id.* at ECF 7-8.)  The Seventh Circuit rejected Advance Cable's attempt to rely on this very same "after-the-fact development":

> Advance sees in this filing an implicit acknowledgement from Cincinnati that its position that cosmetic damage was excluded from its coverage was "baseless" back in 2011 and 2012, when the events of this case occurred.  This is pure speculation.  A 2013 filing says nothing about what Cincinnati knew or did not know in 2011.  Regardless, even if the filing had occurred in 2011, it would fail to show that Cincinnati's contrary position in the current case is not reasonable or that Cincinnati was reckless in denying coverage here.  Sometimes policies are amended for purposes of clarification; sometimes for purposes of change.

788 F.3d at 749.  Nothing about the present case, which Welton repeatedly argues is nearly identical in its essentials to *Advance Cable* for other purposes, would compel -- or even permit -- a contrary conclusion here.

Turning to Cincinnati Insurance's coverage evaluation, the court first notes what Welton does *not* argue.  Specifically, Welton does not contend that Cincinnati Insurance failed to perform sufficient investigation into the *factual* circumstances surrounding the claim.  Cincinnati Insurance hired a third-party engineering firm to inspect the roofs and acquired a report that indicated the denting was merely cosmetic, something Welton apparently did not contradict at the time.  Cincinnati Insurance also *repeatedly* invited Welton to rebut the SRI report insofar as the nature and/or extent of the denting was concerned.  Not only did Welton not do so, its contractor's flat assertion in his January 25

14

e-mail that the metal roof panels were "damaged" was wholly unhelpful, unsupported as it was by any analysis or reasoning, and no reasonable factfinder could conclude that Cincinnati Insurance acted in bad faith by refusing to consider it as evidence of structural damage over its own expert's conclusion to the contrary.

Rather, Welton focuses on facts that, in its view, suggest Cincinnati Insurance's application of the Policy was objectively unreasonable -- apparently intending a subtly separate but related argument to Welton's contention that Cincinnati Insurance's *conclusion* was not objectively reasonable. For example, Welton argues that Jorgenson was aware the Policy did not explicitly distinguish between structural and cosmetic damage (Curtis L. Jorgenson Dep. (dkt. #115-6) 52:6-9); did not consult a dictionary to determine what "direct physical loss" meant (*id.* at 41:25-42:6); and did not review case law in interpreting the Policy (*id.* at 42:12-17). But this is asking too much -- particularly where, as here, the court has already concluded that Cincinnati Insurance's interpretation of the Policy was plausible, if ultimately wrong. *See Advance Cable*, 788 F.3d at 749 ("Advance's argument that Cincinnati should have 'shown its work,' right down to revealing the dictionary definitions the company reviewed internally when evaluating coverage, goes well beyond anything that the law requires to defeat an allegation of bad faith."). Certainly, Welton cites *no* case law suggesting that an insurer is required to take those specific steps to avert a finding of bad faith. Likewise, even assuming it is true that Cincinnati Insurance did not hire an attorney to evaluate coverage until after it denied the claim, Welton cites *no* case law suggesting an insurer has a duty to hire outside counsel before denying an insurance claim. Finally, Welton's contention that Cincinnati Insurance "failed to allow" it to inspect the

roofs jointly with independent adjustor Tim Coppock rings hollow, given that Welton repeatedly *declined* to provide its own assessment of the denting to Cincinnati Insurance.

Even when viewed in the light most favorable to Welton, this record reveals that Cincinnati Insurance took reasonable steps in evaluating its claim. That Cincinnati Insurance came to the wrong conclusion based on an ultimately erroneous interpretation of the Policy's language is not sufficient by itself to impose bad faith liability for reasons already discussed above and, more importantly, decidedly definitively by the Seventh Circuit in *Advance Cable,* 788 F.3d at 748. As in *Advance Cable*, therefore, this court will grant Cincinnati Insurance's motion for summary judgment on Welton's claim that Cincinnati Insurance exercised bad faith in its *pre-suit* refusal to pay benefits under the Policy.[5]

## III. Other Defenses

The court last turns to Cincinnati Insurance's newly-asserted defenses to coverage.[6] Cincinnati Insurance now contends that Welton indisputably breached its *own* obligations under the Policy by: (1) failing to provide complete inventories of the purportedly damaged

---

[5] As the Wisconsin Court of Appeals explained in *Samuels Recycling Co. v. CNA Insurance Cos.*, 233 Wis. 2d 233, 588 N.W.2d 385 (Ct. App. 1998), "[i]t is the state of the law at the time the claim is denied that is dispositive" in determining an insurance company's liability for the tort of bad faith. *Id*. at 250. A separate question may exist to the extent that Cincinnati Insurance forced Welton to incur unnecessary litigation fees and costs in having to respond to its motion for summary judgment despite this court's final judgment in *Advance Cable*. *See DeGuelle v. Camilli*, 724 F.3d 933, 935 (2013) (discussing application of issue preclusion under Wisconsin law pending appeal); *Vinich v. Vorwald*, 664 F.3d 206, 216 (7th Cir. 2012) (same). However, any award of fees or other enhanced penalties in that regard does not sound in a common law tort, but rather under Fed. R. Civ. P. 11, an issue better taken up in a motion after verdict.

[6] Cincinnati Insurance leaves unclear whether these new defenses eliminate coverage altogether or merely preclude Welton from relying on any evidence of structural damage at this time, but because the court has already found that it does not matter whether the denting is structural or purely cosmetic for coverage purposes, the court will focus its analysis on whether any of the asserted defenses eliminate coverage generally, leaving the question of the *amount* of damages for trial.

property with quantities, costs, values and the amount of loss claimed in violation of § D.3.a(5); (2) refusing to cooperate with Cincinnati Insurance in investigating the claim in violation of § D.3.a(8); and (3) withholding material information in violation of its implied duty of good faith and fair dealing.[7]

### A. Proof of Loss

Taking first the proof-of-loss defense, Cincinnati Insurance correctly points out that "[s]ubstantial performance with the terms of the contract is necessary for [an] insured to recover under the policy." *Davis v. Allstate Ins. Co.*, 101 Wis. 2d 1, 7, 303 N.W.2d 596 (1981); *see also Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 309, 347 N.W.2d 595 (1984), *overruled in part on other grounds by DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 547 N.W.2d 592 (1996); *Duir v. John Alden Life Ins. Co.*, 573 F. Supp. 1002, 1008 (W.D. Wis. 1983), *aff'd*, 754 F.2d 245 (7th Cir. 1985); 2 Arnold P. Anderson, *Wisconsin Insurance Law* §§ 12.19 (6th ed. 2010).  Even so, "[w]here a party has met the essential purpose of the contract, he has substantially performed under the contract." *Davis*, 101 Wis. 2d at 7.

Thus, for example, the Wisconsin Supreme Court upheld a jury's finding of an insurance company's liability on a policy even where the insured had technically failed to render "a proof of loss, signed and sworn to by the insured," as the policy required.  *Fehring*, 118 Wis. 2d at 307.  The court suggested that the purpose behind the proof of loss requirement was akin to the purpose underlying insurance policy notice requirements: "to afford the liability carrier an opportunity to investigate possible claims against the policy."

---

[7] Cincinnati Insurance's opening brief raises another alleged breach -- that Welton breached its duty to provide prompt notice of the claim -- but its reply brief no longer requests summary judgment on the basis of late notice.  (Def.'s Br. Reply (dkt. #120) 27.)  Accordingly, the court does not discuss that argument further.

*Id.* at 308 (quoting *Gerrard Realty Corp. v. Am. States Ins. Co.*, 89 Wis. 2d 130, 140, 277 N.W.2d 863 (1979)).  Although the Fehrings had not sent in the sworn proof of loss *form*, the court found they had "immediately notified Republic of their loss, and Republic was subsequently able to begin an immediate investigation of the claim." *Id.* at 309.  In light of that, the court held that there was "ample credible evidence in the record from which the jury could properly conclude that under the circumstances, the Fehrings had complied with the essential purpose of the notice requirement stated in the policy." *Id.*

Here, Cincinnati Insurance points to Welton's claimed refusal to provide complete inventories of the damaged property, including costs, repair estimates and so on.  But *Fehring* does not stand for the proposition that even a technical breach of the policy yields a loss in coverage.  To the contrary, *Fehring* and similar cases indicate the real question is whether the insured has met the essential *purpose* of the provision -- that is, permitting the insurance company to launch its own investigation and handle the claim in an informed manner.  *See, e.g.*, *Duir*, 573 F. Supp. at 1008 ("Proof-of-loss requirements are met whenever, 'sufficient information is given the insurer from which it can form an intelligent estimate of its rights and liabilities under the contract.'") (quoting 3 *J. Appleman, Insurance Law and Practice*, §§ 1444 at 113 and 1449 at 10 Supp. (1967, Supp. 1982)).

In this case, a reasonable jury *could* find that Welton substantially complied with the purpose behind the proof-of-loss requirement by informing its insurance agent Hausmann in September and Cincinnati Insurance directly in November, that hail had dented the roofs of its buildings.  Cincinnati Insurance was then able to commence its own investigation and concluded, incorrectly as it turns out, that the policy did not cover the denting based on its interpretation of "direct physical loss."  To the extent Welton is claiming damages for

"cosmetic denting," it is difficult to see what good Welton providing repair estimates and costs would have done, since Cincinnati Insurance had already decided that it was not obligated to pay for any repairs to the roofs. *Cf. Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶¶ 62-63, 261 Wis. 2d 4, 660 N.W.2d 666 (no prejudice based on late notice in duty-to-defend case where insurer would have handled claim the same way with earlier notice; duty to defend, therefore, not abrogated based on breach).[8]

### B. Lack of Cooperation

Cincinnati Insurance next argues that Welton's breach of the cooperation provision undermines coverage.  As with a timely proof of claim, cooperation clauses are important insofar as they "protect the insurer's interests by permitting it to obtain relevant information concerning the loss while the information is fresh, decide on its obligations, and protect itself from fraud." *Ansul, Inc. v. Emp'rs Ins. Co. of Wausau*, 2012 WI App 135, ¶ 29, 345 Wis. 2d 373, 826 N.W.2d 110 (citing 14 Lee R. Russ, *Couch on Insurance* § 199:4 (3d ed. 1999)).  In *Ansul*, for example, the insured did not give its insurer, Lloyd's, notice of a possible claim until it actually filed a lawsuit several years later, depriving Lloyd's "of *any* ability to investigate the scope of, or basis for, Ansul's liability outside the adversary process."  2012 WI App 135, ¶ 35 (emphasis added).  Moreover, "Ansul, with full knowledge of the underlying facts, had years in which to mitigate any potential coverage defenses available to Lloyd's, like the known loss doctrine or pollution exclusions found in some of the excess policies." *Id.*  This ran afoul of the cooperation provision, which was

---

[8] To the extent Welton is now claiming structural damages, perhaps Cincinnati Insurance has some claim of prejudice (either because it cannot now differentiate between past and present structural damages or would have paid those damages sooner), but the court cannot say Cincinnati Insurance has demonstrated *as a matter of law* that Welton did not substantially comply with the purpose of the proof-of-loss requirements on this record.

"designed precisely to prevent fraud." *Id.* Accordingly, the court concluded that Ansul had breached the cooperation provisions and prejudiced Lloyd's, affirming the decision to deny coverage.

Cincinnati Insurance argues that it need not show actual prejudice arising from Welton's breach of its cooperation provision under the Policy, citing *Schaefer v. Northern Assurance Company*, 182 Wis. 2d 148, 160, 513 N.W.2d 615 (Ct. App. 1994). In that case, the Wisconsin Court of Appeals confirmed that Wis. Stat. § 632.34 had abrogated the common-law requirement of prejudice in non-cooperation cases, but this was true only for cases involving *automobiles*, to which Wis. Stat. § 632.34 expressly applies. In contrast, the Wisconsin Court of Appeals held as recently as 2012 that in the context of an excess liability policy, "[n]otwithstanding proof of a contractual breach, . . . an insurer must also prove the breach is material and prejudicial." *Ansul*, 2012 WI App 135, ¶ 32 (quoting *Dietz v. Hardware Dealers Mut. Fire Ins. Co.*, 88 Wis. 2d 496, 503-04, 276 N.W.2d 808 (1979)); *see also* 2 *Wisconsin Insurance Law, supra*, at § 12.24 ("In non-automobile cases, common law requires the insurer to establish prejudice as a result of the lack of cooperation by an insured.").

In the alternative, Cincinnati Insurance argues that it *was* prejudiced by Welton's non-cooperation. Specifically, Cincinnati Insurance relies upon the testimony of its Superintendent of Property Claims, Bruce Graham, that he would have liked to have received repair cost estimates for use in his coverage determination. At the same time, however, Cincinnati Insurance acknowledges -- as it must -- that the major issue in this lawsuit has always been "whether the cosmetic denting was covered in the first instance." (Def.'s Br. Reply (dkt. #120).) Again, it is difficult to understand how the lack of repair

cost estimates would have affected Cincinnati Insurance's ability to investigate or evaluate the claim to the extent it had already concluded, based on its own expert's evaluation, that there was no need to undertake any repairs or pay any benefits at all on purely cosmetic damages.[9]

### C. Good Faith and Fair Dealing

Finally, Cincinnati Insurance argues that Welton breached the implied covenant of good faith and fair dealing by withholding material information, including any rebuttal it may have had to the SRI report. There is some authority suggesting bad faith by an insured may be an available defense to an insurer. *See, e.g.*, 2 *Wisconsin Insurance Law*, *supra*, at § 9.46 ("If a party fails to cooperate or carry out the obligation of good faith and fair dealing, this defense may be available to *either* the insured or the insurance company.") (emphasis in original). But Cincinnati Insurance cites *nothing* suggesting that a breach of the duty of good faith is a defense to *coverage*, nor has the court found any support for such a proposition.

To the contrary, authority of which the court is aware suggests only that an insured's bad faith can serve as a defense to the insured's own *bad faith claim*. *Id.* ("A court may also instruct the jury, in a proper case, that if an insured's breach of the implied duty of good faith and fair dealing contributed to the insurance company's failure to investigate or make

---

[9] The same may even be true of Welton's failure to submit earlier its evidence of structural damage to the roof, if any. While it *may* have changed the way Cincinnati Insurance handled the claim, Cincinnati almost certainly would have adhered to their own expert's opinion and denied the claim on the basis of an erroneous coverage interpretation. At the very least, the question of whether Welton failed to cooperate and somehow prejudiced Cincinnati Insurance cannot be resolved on its motion for summary judgment, where the court must view the record in the light most favorable to Welton, especially given that Welton's claim to a replacement roof or repair of all denting is likely to exceed any more limited claim for structural damages.

payment of a claim, such conduct may constitute a defense to the bad-faith claim of the insured."); Douglas R. Richmond, *Insured's Bad Faith as Shield or Sword: Litigation Relief for Insurers?*, 77 Marq. L. Rev. 41, 43 (1993) (examining "argument that insurers defending tort actions for their alleged bad faith should have available to them the traditional tort defense of comparative fault").  Since the court has already determined that Cincinnati Insurance is entitled to summary judgment on the question of whether its coverage decision constituted bad faith, it need not go down the road of comparative bad faith.

Even assuming that a "breach of the duty of good faith defense" *does* apply to limit liability for coverage, as opposed to rebutting a plaintiff's independent tort claim for bad faith, the court is not persuaded that Cincinnati Insurance has established its entitlement to that defense as a matter of law.  At bottom, the conduct of which it complains is the same conduct that it complains constitutes a breach of the explicit terms of the policy -- the failure to provide requested cost estimates and the failure to rebut the SRI report.  The court has already explained why that defense is not appropriate for summary judgment on this record.  At most, therefore, Welton's claimed "bad faith" presents another question for the trier of fact.

ORDER

IT IS ORDERED that defendant The Cincinnati Insurance Company's motion for summary judgment (dkt. #95) is GRANTED IN PART and DENIED IN PART as set forth in the opinion above.

Entered this 15th day of September, 2015.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge